CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 0 4 2011

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

SAMANTHA L. MUSICK, AN INFANT, BY )
AND THROUGH HER MOTHER AND NEXT )
FRIEND, AMY L. MUSICK, )
                      )
        Plaintiff, )
                      )
v. )   Civil Action No.: *1:11-CV-00005*
                      )
DOREL JUVENILE GROUP, INC. )
                      )
SERVE: )
CORPORATION SERVICE COMPANY )
84 STATE STREET )
BOSTON, MA 02109 )
                      )
AND )
                      )
COSCO MANAGEMENT, INC. )
                      )
SERVE: )
CSC ENTITY SERVICES, LLC. )
2711 CENTERVILLE RD. SUITE 400 )
WILMINGTON, DE 19808 )
                      )
        Defendants. )

## COMPLAINT

COME NOW the plaintiff, Samantha L. Musick, an infant, by and through her mother and next friend, Amy L. Musick, by counsel, and in support of her Complaint against the defendants alleges as follows:

## PARTIES

1.      Samantha L. Musick is an infant whose date of birth is -------, 2003. Samantha L. Musick resides with her mother, Amy L. Musick, and her father, Earl Musick, in Honaker, Virginia.

2.      Dorel Juvenile Group, Inc. ("DJG") is a Massachusetts corporation with its principal place of business in Indiana. DJG is a wholly owned subsidiary of Dorel USA, Inc., a holding company which in turn is wholly owned by Dorel Industries, Inc., a Canadian corporation with its principal place of business in Montreal, Canada.

3.      DJG designs, manufactures, markets and distributes infant car seats, or child restraints, globally and within Virginia.

4.      DJG is a merchant of goods including infant car seats designed, marketed and distributed for sale to consumers in Virginia within the territorial division of this Court and has therefore submitted itself to the general jurisdiction and venue of this Court through its direct conduct, substantial marketing activities and sales of its products.

5.      DJG is the corporate successor in interest of Cosco Inc., a former Indiana corporation which was a large manufacturer of child restraints, including infant car seats and high back booster seats in the United States prior to being acquired by Dorel Industries, Inc. in 1988.

6.      Cosco Inc. was merged with Safety1st, another manufacturer of juvenile safety devices acquired by Dorel, Inc., to form DJG, in approximately 2000. DJG then marketed the Cosco brand of infant car seats, including the infant car seat at issue in this case.

7.      Cosco Management, Inc. ("CMI"), is a Delaware Corporation with its principal place of business in Massachusetts. CMI is a wholly owned subsidiary of DJG. CMI is a successor in interest of Cosco, Inc. CMI is an alter ego of DJG and is managed, operated and

Case 1:11-cv-00005-JPJ-PMS   Document 1   Filed 02/04/11   Page 2 of 15   Pageid#: 2

otherwise controlled by DJG. CMI is responsible for the design, testing, and marketing of juvenile products distributed for sale to consumers in Virginia within the territorial division of this Court and has therefore submitted itself to the general jurisdiction and venue of this Court through its direct conduct, substantial marketing activities, and sales of its products.

8.      CMI owns or is otherwise responsible for the defective design of the car seat at issue in this case.

9.      The defendants, Dorel and CMI, design, manufacture, market and distribute consumer products including infant car seats for sale globally.

10.     Dorel describes itself to be among the three largest "juvenile products companies in North America" and the largest manufacturer of car seats in the world.

11.     The majority of Dorel's sales of products such as infant car seats are made to mass merchants and department stores, including Wal-Mart, K-Mart, Toys-R-Us, and others.

12.     On March 28, 2009, Plaintiff's infant was seated in a Dorel Commuter/Ventura High Back Booster seat, properly secured in a vehicle with her family, traveling on Route 11 (Lee Highway) in Bristol, Virginia.

13.     The infant plaintiff and her family were involved in an automobile collision on March 28, 2009 when their vehicle was struck from behind, causing Samantha L. Musick's head to strike the left rear side of the car seat, resulting in catastrophic brain injuries to the infant.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332. The plaintiff and defendants are of diverse citizenship and the amount in controversy exceeds $75,000.

14909/1/3548228v1

15.    Venue is proper in this Court pursuant to Rule 2(b) of the U.S. District Court Rules (W.D. VA.). The plaintiff resides within this judicial district and division, the subject car seat was purchased within this judicial district and division, and the accident giving rise to these claims occurred within this judicial district and division.

## FACTUAL BACKBROUND

16.    Earl and Amy Musick purchased the defendants' car seat at issue from a K-Mart or Wal-Mart store within this judicial division in May of 2008.

17.    The car seat at issue is described by the defendants' advertising literature and instruction manual as a Dorel Commuter/Ventura/High Back Booster seat. The subject car seat is Model Number 22-209-RDO. Additional identifying information on the seat includes: MFG: L#2 8061495 11/27/06. Presumably the seat was manufactured by Dorel on or about November 27, 2006 according to the design by CMI.

18.    Another imprint on the seat states that the seat should not be used after December 2012.

19.    On March 28, 2009, at approximately 9:00 p.m., Samantha L. Musick and her family were proceeding northbound on Lee Highway at its intersection with West Highlands Boulevard in the City of Bristol, Virginia. The Musicks were stopped for a traffic light controlling the intersection.

20.    Amy Musick was driving the family's 1999 Ford Windstar. Earl Musick was riding as a passenger in the front seat, and Samantha L. Musick was properly secured in the Dorel Commuter High Back Booster seat in the middle row. Samantha L. Musick's sisters, infants KM and TM, were seated behind Samantha L. Musick in the vehicle's third row seat.

14909/1/3548228v1

21.     As the traffic light turned green, and Amy began to move their vehicle forward, the Musicks were struck from behind by a 1995 Jeep Wrangler operated by Albert J. Spicer, IV.

22.     With the exception of Samantha L. Musick, none of the passengers in the Musick's vehicle was significantly injured. In fact, none of the other passengers sustained a single broken bone.

23.     Immediately after the impact, the Musicks noticed that Samantha L. Musick was uncommunicative. She was curled into a fetal position in her car seat and did not respond to her parents' calls.

24.     Earl Musick exited the vehicle and Amy removed Samantha from her car seat and handed her to Earl. The remaining occupants were able to exit the vehicle independently before first responders arrived to the scene.

25.     All of the Musicks were initially taken to Bristol Regional Medical Center for evaluation. With the exception of Samantha L. Musick, they were all treated and released with little or no injury. Samantha L. Musick was evaluated and immediately transferred to Johnson City Medical Center in Johnson City, Tennessee.

26.     Samantha L. Musick sustained devastating injuries as a result of striking the left rear edge of her car seat with her head.   She sustained significant skull fractures emanating from an impact point above and behind her left ear.

27.     Samantha L. Musick sustained multiple displaced skull fractures, subdural hematomas, intraparenchymal hematoma and subarachnoid hemorrhage.  Her prognosis upon admission to the hospital was extremely poor and she was not expected to survive.

28.     Samantha L. Musick remained at Johnson City Medical Center until approximately April 29, 2009, at which time she was transferred to Children's Healthcare of

Atlanta at Scottish Rite. She remained at Scottish Rite until approximately June 17, 2009. Since that time, she has required constant medical management and assistance with all activities of daily living.

29.     Samantha L. Musick's injuries include depressed skull fractures, severe traumatic brain injury, quadriplegia, cognitive disorder, seizures, left temporal and left parietal encephalomalacia with subdural effusion and hematoma, cerebral atrophy, hydrocephalus, dysphagia, blown left pupil with ptosis, impaired vision, impaired speech, clonus of the lower extremities, poor head control, poor trunk control, dystonia and associated conditions.

30.     Samantha L. Musick's injuries are permanent and she will require 24 hour care for the remainder of her life.

31.     Prior to the collision, Samantha L. Musick was a healthy, happy child who thrived academically and physically.

32.     Dorel and CMI manufactured and assembled the subject car seat on or about November 27, 2006 and placed the car seat in the stream of commerce for distribution and sale by retailers including Wal-Mart and K-Mart within this judicial district.

33.     At the time of manufacture of the subject car seat, the defendants knew or should have known that such seats must be designed to protect infants to reduce head injuries from rear-end collisions.

34.     The defendants knew that consumers, such as the Musicks, who travel by automobile, were required by law to secure infants of Samantha L. Musick's size in a car seat, and that the purpose of the law was to reduce or prevent injuries to infants like Samantha L. Musick.

14909/1/3548228v1

35.     At the time of the collision, Samantha L. Musick was approximately 44 inches tall and weighed approximately 41 pounds.

36.     Samantha L. Musick was within the height and weight distribution of infants whom Dorel recommended and anticipated to be secured in its Commuter car seat.

37.     The defendants' Commuter car seat did not incorporate padding or other energy absorbing material to protect an infant's head from impact with the hard plastic shell of the car seat.

38.     The defendants knew or should have known that failure to provide padding dramatically increased the risk of injury or death to children secured in the Commuter seat.

39.     The defendants knew expressly from claims made against it prior to the subject accident, as well as from scientific studies and literature published in the automotive and car seat industries, that the failure to incorporate energy absorbing material over the shell of its car seats dramatically, and unnecessarily increased the risk of serious injury and death to infants occupying unpadded seats.

40.     The design of the High Back Booster car seat includes shallow side wings that protrude at a steep angle from the seat back creating an unreasonable risk of injury to infants from striking the unpadded shell.

41.     The design of the Commuter car seat also incorporated sharp (narrow) edges on the side wings with notches which created a foreseeable and unnecessary risk of head injury to infants in rear-end and side-impact collisions.

42.     The unpadded, narrow wings of the Commuter car seat created an unreasonably dangerous and foreseeable impact point for the infant's head which can easily extend beyond the edges of the seat sides.

14909/1/3548228v1

43.     The defendants knew or should have known prior to manufacture of the plaintiff's car seat that its design was defective and unreasonably dangerous for failing to provide padding and wider side wings to prevent the foreseeable risk of head injury.

44.     Despite such knowledge, the defendants failed to test the design of the Commuter car seat with rear-end and side-impact testing which Dorel knew, or should have known, would have established that the design failed to provide adequate head protection, and in fact created unreasonable risks for head injury in such collisions.

45.     Instead, the defendants limited its testing, and therefore design parameters, of the Commuter car seat to the bare minimum standards established by Federal Motor Vehicle Safety Standard 213. Dorel knew expressly at the time of manufacture of the subject Commuter car seat that FMVSS 213 tests only frontal impacts, not rear or side impacts, and that FMVSS 213 was not intended to establish any standard as to what qualifies as a reasonably safe child restraint system design.

46.     With respect to the Federal standard, Dorel was expressly aware of the 1999 admonition of the Administrator of the National Highway Traffic Safety Administration, Dr. Ricardo Martinez who cautioned: "With the safety of our Nation's children at issue, mere compliance with the minimum requirements of the standard is not enough; minimum standards should not be the most in safety design that manufacturers provide."

47.     Since at least 1999 Dorel was likewise aware independently and from Dr. Martinez that simply meeting the minimum Federal standard increased the risk of injury to infants like the plaintiff riding in the Commuter car seat.

48.     Since at least 1974, Dorel (or its predecessors for whom it is responsible) have been aware that "[t]he single most important measure of the injury protection afforded by a

14909/1/3548228v1

restraint system ... is the extent to which it restricts head excursion in all directions." *Tests of Current and Experimental Child Restraint Systems; Stalnaker, R.L.; Society of Automotive Engineers.*

49.     Prior to manufacture of the subject Commuter seat in 2006, the defendants were expressly aware of numerous scientific studies, literature, and tests which demonstrated the effectiveness of including energy absorbing padding to reduce the potential for head injury in child car seats.

50.     Prior to 2006, the defendants were also aware of safer, alternative designs prevalent in the industry which included energy absorbing padding and wider side wings on car seats manufactured by competitors as well as by affiliates of Dorel.

51.     The defendants were expressly on notice prior to 2006 of claims on behalf of infants who sustained catastrophic brain injuries allegedly caused by head impact with the unpadded side wings of Dorel car seats. For instance, a Complaint filed in the U.S. District Court in Kansas in 2004 on behalf of an infant named Reyna alleged in Paragraph 35: "The Dorel Defendants had actual knowledge, prior to the collision in which [the infant] was injured, that the subject Touriva provided no substantive protection to children in impacts that would cause the head of a child to move into one or both of the side wings and that in fact, the subject seat actually caused head injuries that were preventable with other, technologically and economically feasible and available designs. In this regard, the Dorel defendants have been sued several times in cases involving its various safety seats for failure to provide adequate protection in such crashes, including its infant seats, convertible seat, and booster seats."

14909/1/3548228v1

52.     The Complaint in *Reyna* identified three other claims made against Dorel on behalf of catastrophically injured children (Coyle, Vaughan, and Uxa) between 1999 and 2004 with allegations of defect substantially similar to those made herein.

53.     For instance, the infant in the *Coyle* case alleged a massive brain injury as a result of striking his head on the unprotected side wings of the Touriva car seat. The *Vaughan* and *Uxa* cases involved allegations of catastrophic brain injuries which resulted from the infants striking their heads on the unpadded side wings of the defendants' car seat, and the *Reyna* case alleged that the infant "hit her head on one or both of the notched, rigid, unpadded and hard plastic side wings" of the car seat causing the infant to sustain permanent brain damage.

54.     In *Uxa*, Dorel was found by a jury to have been negligent in its design of its Cosco High Back Booster seat for failure to incorporate "wider wings on the side and padding to protect a child's head." *Uxa, et al. v. Dorel Juvenile Group, Inc. et al, 128 S.W.3d 121, 127 (2003).*

55.     The infant in *Uxa*, like Samantha L. Musick, sustained a brain injury as a result of striking his head on the unpadded car seat and was the only occupant of his vehicle to suffer significant injury in the collision.

56.     From 1999 until the subject car seat was manufactured in 2006, despite actual knowledge of these claims and others, the defendants failed to incorporate any changes to the design of its High Back Booster car seat to reduce or eliminate the unreasonable risk of head injury.

57.     Over the same time period and prior to March 28, 2009, the defendants were aware of alternative, safer designs in the industry which incorporated wider, padded side wings and which were economically and technologically feasible.

14909/1/3548228v1

58.     At the time the subject Commuter car seat left the control of the defendants in 2006, it was in a dangerous and defective condition for its anticipated use.

59.     At no time prior to March 28, 2009 did the defendants advise or warn the Musicks about the dangers and risks of injury created by the design of the High Back Booster seat. No notice, instruction or warning was provided to the Musicks alerting them to the dangerous condition of the car seat.

60.     Had the defendant timely advised or warned the Musicks about the dangers and risks associated with the Commuter car seat, the Musicks would not have purchased, or would have returned, the seat and Samantha L. Musick would not have sustained her devastating injuries.

61.     Samantha L. Musick's injuries were proximately caused by the defective condition of the High Back Booster seat, and the car seat was in substantially the same condition immediately prior to the collision as it was when it left Dorel's custody and control.

## COUNT I - NEGLIGENCE

62.     Plaintiff incorporates by reference the preceding factual allegations.

63.     The defendants had a duty to exercise reasonable care to design, test, manufacture, label and market its High Back Booster seat free from defects and without creating an unreasonable risk of injury to infants like Samantha L. Musick. The defendants further had the duty to incorporate design changes to eliminate or reduce the risk of injuries about which it knew, or should have known, were created by the original design of the High Back Booster seat. Dorel also had the duty to instruct and warn purchasers like the Musicks about known dangers and risks associated with the use of its High Back Booster seat.

Case 1:11-cv-00005-JPJ-PMS   Document 1   Filed 02/04/11   Page 11 of 15   Pageid#: 11

64.     The defendants were negligent in the design, testing, manufacture, marketing and warnings with respect to its High Back Booster seat.  Such negligence included:

a.      Producing an unsafe and untested design which permitted the infant's head to strike the hard plastic, unpadded side wing of the seat;

b.      Failing to test the adequacy of the car seat design for rear, oblique, and side-impact collisions;

c.      Failing to incorporate energy absorbing or attenuating padding to reduce or eliminate head injuries caused by striking the car seat sides;

d.      Producing a car seat with narrow side wings which insufficiently restrain the infant's head within the seat thereby creating a risk of injury from striking the car seat sides;

e.      Failing to provide warnings sufficient to describe the risk of injury created by the narrow, hard plastic, unpadded side wings;

f.      Failing to incorporate alternative feasible designs commonly available in the industry which provided deeper side wings with energy absorbing padding;

g.      Continuing to advertise and market the car seat to be safe and effective in preventing injury in foreseeable collisions despite knowledge of defects including those determined to be present in the *Uxa* case;

h.      Failing to warn individuals like the Musicks who had already purchased the car seat about the substantial risk of injury or death created by the known defects.

12

65.    The negligence directly caused and/or contributed to cause the severe injuries sustained by Samantha L. Musick when her head struck the left side wing of the High Back Booster seat on March 28, 2009.

## COUNT II – BREACH OF WARRANTY

66.    Plaintiff incorporates by reference the preceding factual allegations.

67.    The defendants' High Back Booster seat was subject to the implied warranty of merchantability and the implied warranty of fitness for a particular purpose when sold to Samantha L. Musick's parents. The defendants warranted that the car seat was reasonably fit and suitable for ordinary and foreseeable use by infants weighing between 22 and 80 pounds and whose height was between 24 and 52 inches. Samantha L. Musick met these criteria. The defendants further impliedly warranted that its seat was adequately tested, designed, manufactured, and labeled to prevent or reduce injuries to children from crashes including rear, side and oblique impact collisions.

68.    The defendants expressly warranted and advertised that its High Back Booster seat provided children safety from injury in crashes. The defendants further warranted that its High Back Booster seat provided protection from injury and death at least as well, if not better, than the car seats of competitors whose designs included wider side wings and energy absorbing padding.

69.    The Musicks relied upon these express and implied warranties of Dorel when deciding to purchase for Samantha L. Musick the Commuter car seat at issue.

70.    The High Back Booster Seat did not conform to the express and implied warranties promised by the defendants. As a result of the dangerous and defective condition of

its unpadded side wings, the seat was not suitable for use in its ordinary and foreseeable purposes, but instead subjected its occupant to unreasonable risks of injury.

71.  The dangerous and defective condition of the car seat existed at the time that the car seat left the custody and control of the defendants.

72.  As a result of the unreasonably dangerous and defective design of the High Back Booster seat, the defendants breached the express and implied warranties to the plaintiff.

73.  The plaintiff was using the seat according to the instructions and warnings provided by the defendants at the time of injury and within the foreseeable purpose and use anticipated by the defendants at the time the seat was placed in the stream of commerce.

74.  Samantha L. Musick's injuries were proximately caused by the defendants' breach of express and implied warranties.

## PRAYER FOR RELIEF

75.  Plaintiff incorporates by reference the preceding factual allegations.

76.  As a direct and proximate result of the negligence and breach of warranties by the defendants, Samantha L. Musick has been permanently injured and will forever be dependent upon others for all activities of her daily living. She has incurred in the past medical expenses which exceed $500,000, and she will incur in the future significant medical expenses for treatment and accommodation of her injuries. She will forever be dependent upon others for her care, feeding, mobility, hygiene, transport, and housing; all at extraordinary cost, and she will never be able to work at a calling of her choosing.

77.  Plaintiff demands a trial by jury.

14909/1/3548228v1

WHEREFORE, the plaintiff moves this Court for entry of judgment against the defendants in the amount of TWENTY MILLION DOLLARS ($20,000,000.00) with interest thereon from March 28, 2009 and all costs and expenses incurred by the plaintiff in this action.

SAMANTHA L. MUSICK

By: _____
Counsel

S. D. Roberts Moore (VSB No. 3456)
Charles H. Smith, III (VSB No. 32891)
GENTRY LOCKE RAKES & MOORE, LLP
800 SunTrust Plaza
P. O. Box 40013
Roanoke, VA  24022-0013
(540) 983-9300
Fax:  (540) 983-9400
Email: roberts_moore@gentrylocke.com
          trey_smith@gentrylocke.com

T. Shea Cook (VSB No. 34832)
T. SHEA COOK, P.C.
2411 Second Street
P.O. Box 507
Richlands, VA  24641
(276) 963-4332
Fax:  (276) 963-6271

*Counsel for Plaintiff*

14909/1/3548228v1