# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **SAMANTHA L. MUSICK, ETC.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11CV00005 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **DOREL JUVENILE GROUP, INC.,** | ) | By:   James P. Jones |
| | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

*Charles H. Smith, III, and Anthony M. Russell, Gentry Locke Rakes & Moore, LLP, Roanoke, Virginia, and T. Shea Cook, T. Shea Cook, P.C., Richlands, Virginia, for Plaintiff; Lynne Jones Blain, Harman, Claytor, Corrigan & Wellman, Richmond, Virginia, and Walter C. Greenough and Jonathan Judge, Schiff Hardin LLP, Chicago, Illinois, for Defendant.*

The plaintiff, a child seriously injured in an automobile accident while seated in a child safety seat manufactured by the defendant, claims that the seat was defectively designed.  It is claimed that the plaintiff struck her head on the front edge of the seat and that the seat should have had larger and padded side wings which would have prevented the injury.  A jury found that the seat was not defective and the plaintiff has moved for a new trial, contending, among other things, that the verdict resulted from the defendant's misconduct and was contrary to the weight of the evidence.  For the reasons that follow, I must deny the motion for a new trial.

# I

A. Events Surrounding Samantha Musick's Accident.

The plaintiff, Samantha L. Musick, suffered serious brain injury on March 28, 2009, when her family's Windstar mini-van was rear-ended at an intersection.   At the time of the accident, Samantha was five years old and seated in the middle row in a child safety seat called the Dorel Commuter High Back Booster ("HBB") manufactured by the defendant Dorel Juvenile Group, Inc. ("Dorel").   Samantha's mother and father were seated in the front of the mini-van, and her two older sisters were seated in the "wayback" seat of the vehicle.   None of the other passengers were seriously injured in the accident.

Several days after the accident, the plaintiff's father, Earl Musick, traveled to the salvage yard where the wrecked Windstar was stored in order to retrieve personal belongings.   At that time, Musick claims he had no plans for a lawsuit.   He did not retrieve Samantha's child safety seat, but took various photographs of it as well as the interior and exterior of the vehicle.

On April 7, 2009, Musick contacted attorney Shea Cook for legal advice and assistance.   Cook faxed a letter to the salvage yard requesting that Samantha's child seat be placed in a safe place to ensure that no one would dispose of or damage it.   That same day, Cook's investigator retrieved the child seat.   Neither the Musicks

nor their attorney secured the Windstar mini-van or preserved it for future inspection.   On or about May 21, 2009, the vehicle was destroyed by the salvage company.

Samantha later brought this lawsuit against Dorel seeking damages for her injury based on the alleged negligent design of the child safety seat, a failed duty to warn of its dangerous conditions, and breach of express warranties and the implied warranties of merchantability and fitness.[1]   The action is founded on the court's diversity jurisdiction.   *See* 28 U.S.C.A. § 1332(a) (West 2006).

Prior to trial, Dorel moved to dismiss the case due to spoliation of evidence, arguing that the plaintiff's failure to preserve the vehicle was egregious and prejudicial.   I denied the motion, finding that there was no reason for Samantha's parents or her attorney to believe that the Windstar mini-van should have been preserved, since it was not the product at issue.   *Musick v. Dorel Juvenile Grp., Inc.*, No. 1:11CV00005, 2011 WL 5029802, at *2 (W.D. Va. Oct. 24, 2011). Furthermore, I found that the absence of the mini-van was not so prejudicial that it denied Dorel the ability to defend against the claim — the child safety seat at issue was preserved, Dorel had full access to post-accident photographs of the mini-van,

---

[1]   At trial, I entered judgment for the defendant on the express warranty claim.

- 3 -

and Dorel was able to conduct its own crash tests using duplicative Windstar front passenger seats.   *Id*. at *3.

B. PRE-TRIAL DISCOVERY ISSUES.

As the early stages of pre-trial discovery unfolded, plaintiff's counsel was faced with several setbacks.   First, plaintiff's counsel served a request for production on Dorel seeking all documents that discussed, related to, or contained reference to, the use of energy-absorbing materials on the side wings of the HBB. When the lead attorney for Dorel, Walter C. Greenough, responded that Dorel had no such documents, plaintiff's counsel filed a Motion to Compel.

A hearing on the Motion to Compel was conducted before the magistrate judge on July 15, 2011, during which attorney Greenough assured the court that Dorel had never considered adding foam to the side wings of the HBB.   However, plaintiff's counsel presented documents that they had independently obtained from discovery taken in a similar case against Dorel, *Cardenas v. Dorel Juvenile Grp. Inc.*, 230 F.R.D. 611 (D. Kan. 2005).   After further review of the materials provided by plaintiff's counsel, including evidence that the HBB may have been part of Dorel's Protective Foam Project ("PFP"),[2] the magistrate judge found that Dorel's

_____

[2]   The term "Protective Foam Project" has been used throughout this case to describe a project undertaken by Dorel in 2002 in which it considered adding protective foam to the side wings of all of its child safety seats manufactured for distribution in the

- 4 -

response to the request for production was inaccurate and ordered Dorel to produce all responsive documents.

Consequently, Dorel produced additional documents, including a computerized depiction of the HBB with added foam, as well as a multi-page document showing that Dorel specifically considered pulling the HBB from the market to add foam to its side wings.   Evidence that the HBB was in fact part of the PFP also came from the deposition testimony of at least three former Dorel employees.   One of these former employees, Richard Glover, was Dorel's Rule 30(b)(6) corporate representative.   *See* Fed. R. Civ. P. 30(b)(6).   Despite being produced as the corporate designee, Glover possessed extremely limited information concerning the PFP and admitted that he did not know why the decision was made to include foam on some of Dorel's seats but not others.

Faced with this evidence, Samantha filed a Motion for Discovery Sanctions Based on Defendant's Failure to Comply with Rule 30(b)(6) (ECF. No. 95) and a Motion for Discovery Sanctions Based on False Statements by Defendant and Failure to Produce Documents as Ordered (ECF No. 128).   At a hearing on the motions, Greenough admitted that his prior statements to the court were incorrect, stating that he had simply "forgotten" that the documents found in the *Cardenas*

---

United States.

- 5 -

case file existed.   Consequently, the magistrate judge granted a discovery sanction
against Dorel precluding it from offering evidence as to why it chose not to add foam
to the side wings of the HBB, a ruling that I later upheld.   *See Musick v. Dorel
Juvenile Grp., Inc.*, No. 1:11CV00005, 2011 WL 5241692, at *1 (W.D. Va. Nov. 1,
2011).   The magistrate judge also ordered plaintiff's counsel to provide the court
with an itemized, sworn statement of the fees and expenses incurred "specifically in
an effort to prove that the High Back Booster was included in the 'Protective Foam
Project' and why the determination was made that foam should not be added to it."
*Musick v. Dorel Juvenile Grp., Inc.*, No. 1:11CV00005 (W.D. Va. Oct. 14, 2011)
(order granting plaintiff's motions for discovery sanctions).[3]

   C. Evidence at Trial.

      At trial, Samantha contended that her HBB safety seat was defective, and that
her injuries were caused when her head struck the unpadded front edge of one of the
side wings of the seat.   Dorel denied this, asserting that the HBB was not defective
and that Samantha's injuries were in fact caused when, as a result of the rear impact,
her father came up and over the back of his front passenger seat and struck Samantha
in the head.

_____

      [3]   Plaintiff's counsel later provided the court with a timely statement seeking fees
and expenses in the amount of $208,510.79.   The magistrate judge granted an award of
fees, but only in the amount of $24,215.85.   Both parties have objected to the magistrate
judge's order, and I will address these objections in a separate opinion.

With respect to the issue of causation, both parties offered ample evidence to support their respective theories.   For instance, Samantha provided expert testimony from Dr. Joseph Burton and Dr. Stefan Duma that her injuries were caused when the left side of her head was struck by the front edge of the left side wing of the seat.   (Tr. 25, Nov. 2, 2011; Tr. 17-21, 37-43, Nov. 9, 2011.)   On the other hand, Dorel presented expert testimony from Dr. Catherine Corrigan that Samantha's injuries were caused when, as a result of the rear impact, her father moved backward and collided with the left side of Samantha's head.   (Tr. 62-65, 79-80, Nov. 10, 2011.)   Dorel also showed that testing conducted by Dr. Corrigan demonstrated that the risk of brain injury from hitting the side wing of the HBB was less than one percent.   (Tr. 113, Nov. 10, 2011.)   As discussed below, however, the jury ultimately did not reach the issue of causation because it found that the seat was not defective.

The undisputed evidence at trial established that, while the HBB was *designed* in 1997 with three-fourths of an inch of head foam, it was manufactured with no foam in the head area.   (Tr. 81, 84, Nov. 8, 2011, morning.)   Dorel offered no explanation as to why foam was not added to the HBB, even though the cost of the head foam would have been only forty-seven cents per unit.   (Tr. 81, Nov. 8, 2011, morning.)   Furthermore, the HBB was the only child safety seat involved in the PFP

that did not get protective foam added to its side wings.    (Tr. 6, 15, Nov. 8, 2011, afternoon.)

Over the course of the trial, Samantha provided an abundance of testimony on the issue of defect.    Specifically, expert witness Gary Whitman opined that the HBB was defective for its failure to incorporate wider, padded sing wings.    (Tr. 15, 29-30, 92, Nov. 8, 2011, morning.)    Additionally, Samantha introduced evidence of scientific literature demonstrating knowledge in the child safety seat industry that large side wings and energy absorbing padding were necessary to provide good protection to children.    (Tr. 27, 48-54, 70-73, 78-80, Nov. 8, 2011, morning; Tr. 112-13, Nov. 8, 2011, afternoon.)    There was also evidence that head drop tests performed by Dorel in 2005 revealed that half an inch of expanded polystyrene ("EPS") or expanded polypropylene ("EPP") foam padding reduced the danger of head injury by one third.    (Tr. 12-15, Nov. 8, 2011, afternoon.)    Finally, testimony from Dorel's marketing employees established that foam was an important element in consumer purchase patterns.    (Tr. 48-49, Nov. 7, 2011; Tr. 137, Nov. 8, 2011, afternoon.)

Dorel countered Samantha's evidence on the issue of defect with expert testimony from Dr. William Van Arsdell.    Dr. Van Arsdell stated that the HBB's design was reasonable and not defective, explaining why padding would not have

improved the HBB's performance in the accident at issue.   (Tr. 189-90, 205, Nov. 11, 2011.)   Dorel also repeatedly noted that the HBB not only met, but greatly exceeded, the requirements of Federal Motor Vehicle Safety Standard 213 ("FMVSS 213"), the federal safety regulation with which all child safety seats must comply before they may be sold in the United States.   Although Samantha argued that FMVSS 213 was irrelevant because it did not include a test for rear impacts, Dorel's witnesses pointed out that this was because the National Highway Traffic and Safety Administration ("NHTSA") determined that all seats would easily meet any such rear impact test.   Furthermore, Terry Emerson, Dorel's Director of Quality Assurance, Child Restraint Systems, and Regulatory Affairs, described Dorel's extensive testing of the HBB in frontal impacts at levels beyond those required by FMVSS 213 and explained that the HBB performed comparable to safety seats with large, padded side wings.   (Tr. 27-32, Nov. 11, 2011.)

At the conclusion of the evidence, the jury was instructed and sent to begin deliberations.   The jury twice asked the court to answer questions better clarifying the issues concerning defect during deliberations.   First, the jury asked whether they must decide "defect," or whether it was sufficient to decide the case solely on the "cause" of Samantha's injuries.   I directed the jury that they must first decide the question of defect before addressing the cause of Samantha's injuries.   Several

- 9 -

hours later, the jury asked the court to more clearly define "defect."   I declined and suggested that the jury consult the definition given by the court's earlier instructions. After approximately six hours of deliberation, the jury returned a verdict for Dorel on the ground that Samantha had not proven by the preponderance of the evidence that the HBB was defective.

The plaintiff has moved for a new trial based on several different theories. The plaintiff argues that the trial was fundamentally unfair due to the defendant's misconduct, that the jury verdict was contrary to the clear weight of the evidence concerning defect, and that some of the jury instructions were erroneous.   The motion has been briefed and argued and is ripe for decision.

II

A. FUNDAMENTAL UNFAIRNESS.

Samantha begins by arguing that the trial was fundamentally unfair due to many episodes of Dorel's alleged willful misconduct before and during trial. Federal Rule of Civil Procedure 60(b)(3) permits the court to order a new trial if a party engages in fraud, misrepresentation, or other misconduct.   *See* Fed. R. Civ. P. 60(b)(3).   In order to establish that a new trial is warranted, the moving party "must (1) have a meritorious defense; (2) prove misconduct by clear and convincing

evidence; and (3) show that the misconduct prevented [her] from fully presenting [her] case." *Tunnell v. Ford Motor Co.*, 245 F. App'x 283, 288 (4th Cir. 2007).   If the moving party meets this burden, "[t]he court then balances the policy favoring finality of judgments against the need to do justice to the moving party to determine whether a new trial is appropriate." *Id*.

Applying these standards to the plaintiff's allegations, I find that a new trial is not warranted on this ground.

Samantha primarily argues that the trial was fundamentally unfair because Dorel allegedly manufactured trial testimony through Richard Glover to "explain away" its SMART Project.   If Dorel had fraudulently manufactured or fabricated testimony, this certainly would be grounds for a new trial.   However, I find Samantha's allegations to be unsubstantiated.

As discussed, Dorel was sanctioned for initially failing to produce relevant documents related to the HBB.   One of these documents included correspondence regarding the SMART Project, Dorel's plan in 2003 to replace the preexisting HBB design with a so-called "SMART" booster seat with "impact foam."   Samantha claims that, while attorney Greenough indicated to the magistrate judge at the hearing on the motions for sanctions that the SMART Project was never implemented, defense witness Glover later testified at trial that the SMART Project

- 11 -

was executed and that Samantha's safety seat was actually the SMART booster. Samantha argues that Dorel "fabricated" this testimony in an attempt to suggest to the jury that Samantha's HBB already had impact foam and thus, additional foam padding would not have prevented her injuries.

First, while it is true Glover testified that the SMART version of the HBB went into production (Tr. 100, Nov. 11, 2011), it is unclear whether attorney Greenough specifically stated that the SMART Project in its entirety was never implemented. At the hearing on the motions for sanctions, the magistrate judge questioned Greenough about a document related to the SMART Project:

> THE COURT:    Why was this document not produced in response to the request for documents dealing with consideration of foam being added to that High Back Booster?
>
> MR. GREENOUGH:    Because it was in the same package as the foam project. It was a project that never went anywhere so I had forgotten about it because it never went anywhere.

(Tr. 27, Oct. 12, 2011.)   Greenough's statement could be construed to mean that the PFP was never implemented, that the SMART Project was never implemented, or that any part of the SMART Project supposedly relating to energy-absorbing foam was never implemented.   Therefore, I find that Samantha is unable to prove Dorel's misconduct by clear and convincing evidence.

Regardless, Greenough and Glover's statements are irrelevant to the main issue at trial — whether Samantha's HBB was defective due to the lack of EPS/EPP energy-absorbing padding and/or wider side wings.   Samantha's argument appears to confuse "impact foam," a padded element used mainly for comfort, with EPS/EPP foam, a type of energy-absorbing padding used as a safety feature on some child safety seats.   While Dorel's PFP included the addition of EPS/EPP foam to some of its child safety seats,[4] its SMART Project never involved EPS/EPP foam.   Instead, the SMART Project was a "refresher" plan to enhance the aesthetics of the existing HBB.   (Tr. 90-93, Nov. 11, 2011.)   The SMART Project did incorporate the addition of "impact foam" to the HBB, but uncontradicted testimony from Emerson established that "impact foam" was a name used by Canadian authorities to refer to comfort foam that had no safety benefits.   (Tr. 4-5, Nov. 11, 2011.)

Consequently, Glover's testimony regarding the SMART Project was largely immaterial to the issue of defect.   In fact, Glover specifically stated that, although the SMART Project was implemented, EPS/EPP foam was never added to Samantha's HBB safety seat:

Q      Was EPP or EPS foam ever added to the high back booster seat?

A      No, sir.

---

[4]   As previously discussed, the HBB never received EPS/EPP foam as part of the PFP.

- 13 -

Q      Did the Smart version of the high back booster seat with the new styling look ever go into production?

A      Yes, it did.

Q      Do you see it in court today?

A      Yes, I do.   Samantha's seat was one of those seats.

(Tr. 100, Nov. 11, 2011.)

In order to grant a new trial based on alleged false testimony, there must be proof that without the false testimony, a jury might have reached a different conclusion.  *See Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, No. 4:10CV00007, 2011 WL 1655810, at *12 (W.D. Va. May 3, 2011).  I find it highly unlikely that Glover's testimony regarding Dorel's SMART Project — a project essentially unrelated to the safety of the HBB — was capable of altering the jury's decision.  Given this finding, and considering the deference and respect I must give to a jury's verdict, I conclude that a new trial is not warranted.

Samantha next alleges that fundamental unfairness was caused by Dorel's misconduct during discovery.  I disagree.  While it is correct that Dorel initially failed to produce documents showing that the HBB was part of Dorel's PFP, Samantha eventually obtained the concealed evidence.  In fact, not only did Samantha acquire the information from outside sources, but Dorel later disclosed the

documents pursuant to the magistrate judge's order and far in advance of trial. Thus, Dorel's pre-trial misconduct did not prevent Samantha from fully presenting her case, and she is unable to establish that a new trial is warranted on this ground. *See, e.g., Tunnell v. Ford Motor Co.*, 245 F. App'x 283, 288 (4th Cir. 2007) (holding that a district court does not abuse its discretion in denying a motion for a new trial based upon discovery misconduct where the moving party has learned much of the undisclosed information from other sources).

Furthermore, Dorel's misconduct already has been substantially sanctioned. The magistrate judge granted a discovery sanction against Dorel precluding it from offering evidence at trial as to why it chose not to add foam to the side wings of the HBB. *See Musick v. Dorel Juvenile Grp., Inc.*, No. 1:11CV00005 (W.D. Va. Oct. 14, 2011) (order granting plaintiff's motions for discovery sanctions).[5]   Samantha argues that the protective effect of the discovery sanction was minimized when Dorel's attorney, Greenough, purportedly disregarded it during opening and closing statements.   I disagree.   Any violation of the sanction during Greenough's opening was quickly reprimanded and corrected in front of the jury.   (Tr. 176-80, Oct. 31, 2011.)   Moreover, mere insinuation that Dorel was generally concerned with the

---

[5]   Samantha argues that she should have been allowed to introduce evidence before the jury establishing the factual foundation that led to the discovery sanction.   However, I find that such evidence is collateral and would have served only to distract the jury from the main issues at trial.

safety of its products was not a violation of the discovery sanction.  (Tr. 78-80, Nov. 14, 2011.)

Samantha also claims that she was fundamentally prejudiced when Dorel allegedly violated the court's pre-trial ruling concerning the fault of Albert Spicer, the driver of the vehicle that rear-ended the Musicks.  Prior to trial, I granted Samantha's Motion in Limine to Exclude Any Argument, Evidence, and/or Comment Concerning Albert Spicer's Fault for the Accident and Other Legal Action Pursued by the Plaintiff (ECF No. 89), holding:

> While the defendant may present evidence as to the facts of the accident such as the high speed of the impact, and his . . . inattention as proof of that speed, it may not present direct evidence or argument of Spicer's negligence.  The facts of the accident may imply Spicer's fault, but otherwise his fault is irrelevant.

(Tr. 17, Oct. 13, 2011.)  Samantha argues that Dorel's cross examination of her accident reconstruction expert, Ronald Kirk, as well as a portion of attorney Greenough's closing argument, violated the court's ruling.

I find that Samantha is unable to show any prejudicial misconduct by Dorel. Dorel's cross examination of Kirk did not elicit prohibited testimony, but simply brought forth evidence regarding the facts of the accident:

> Q     Did I understand your opinion, maybe you didn't talk about this, did Mr. Spicer apply his brakes before he hit the Musick vehicle?
>
> A     He told me he did not, nor after.

- 16 -

Q      Did Mr. Spicer engage any defensive steering maneuver at all before he hit the Musick vehicle?

A      My understanding is he didn't see the vehicle soon enough to do that.

Q      At the time of this crash Mr. Spicer was not paying attention to the roadway; is that fair?

A      That's apparent, yes.

Q      And Mr. Spicer couldn't have been paying attention to the roadway at the time of this crash because he was doing something else at the time of this crash?

A      I think that's what he says.

Q      Mr. Kirk, is it fair to say that a distracted driver is not always the best judge of his own speed?

A      I think it's fair to say that many drivers, whether distracted or not, are not a good judge of their own speed.

. . .

Q      Mr. Kirk, you told us that Mr. Spicer was not paying attention to the roadway, correct?

A      I have no firsthand knowledge of that.   That's what he told me. He told me he was texting, so apparently he was not paying attention.

(Tr. 160, 166-67, Nov. 1, 2011.)   Kirk's testimony that Spicer was inattentive and

texting at the time of the accident was to establish that Spicer's estimate of his speed

was unreliable, not to show Spicer was negligent or caused Samantha's injury.

- 17 -

This is exactly the purpose for which I agreed such testimony was relevant and admissible.

Additionally, counsel for Dorel's argument in closing that the forces of the accident were the true cause of Samantha's injuries, not Dorel's safety seat, was not improper.  Attorney Greenough simply argued, "if you must place blame, please place it where it belongs, and that's not on Dorel.  It's on people like the guy who hit them, or it's even on the front seat of their car for collapsing."  (Tr. 125, Nov. 14, 2011.)  Spicer did not testify and his name was never mentioned during closing, and there is no evidence that the jury was confused as to the proper issues in the case, or otherwise distracted from its consideration of those issues.  Moreover, the two questions submitted by the jury to the court during deliberations illustrate that it was focused strictly on *Dorel's* liability, not that of anyone else.

Finally, Samantha argues that the trial was fundamentally unfair because she was prohibited from introducing evidence of two other lawsuits against Dorel involving claims of head injuries.   This argument has no merit.

First, as I previously ruled in limine, the facts of the two other lawsuits that Samantha sought to introduce at trial — the *Uxa* and *Coyle* cases — were not substantially similar to the incident in question, making them irrelevant.  *See Musick v. Dorel Juvenile Grp., Inc.*, No. 1:11CV00005, 2011 WL 5110404, at *1-2

(W.D. Va. Oct. 22, 2011).   Second, the court's decision to disallow evidence of other lawsuits against Dorel was balanced by the fact that Dorel was similarly banned from referring to its defense verdict in another case concerning the HBB, and from arguing that there were *no* prior incidents involving the HBB.   Finally, despite my prior ruling excluding such evidence, plaintiff's counsel repeatedly attempted to refer to the existence of other lawsuits against Dorel.   (Tr. 207-09, 214-17, Nov. 11, 2011.)   Such disregard of the court's ruling risked the possibility of unfair prejudice to Dorel and significantly undermines Samantha's claim of fundamental unfairness.

B.  VERDICT CONTRARY TO CLEAR WEIGHT OF THE EVIDENCE.

Samantha also seeks a new trial under Federal Rule of Civil Procedure 59(a)(1)(A), claiming that the jury's verdict is contrary to the clear weight of the evidence concerning defect.   Rule 59(a)(1)(A) provides for the grant of a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."   Fed. R. Civ. P. 59(a)(1)(A).   The Fourth Circuit has elaborated by stating that a new trial may be granted if "[1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice."   *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996).   "Factual inquiries are the key to examining

- 19 -

whether the verdict is against the clear weight of the evidence."   *Miller v. Pilgrim's Pride Corp.*, No. 5:05CV00064, 2008 WL 178473, at *2 (W.D. Va. Jan. 16, 2008).

Applying this standard to the plaintiff's allegations, I find that the jury's verdict is not against the clear weight of the evidence concerning defect.

Samantha argues that the clear weight of the evidence established that the HBB was defective for its failure to incorporate wider, padded side wings.  She points to expert testimony from Gary Whitman, scientific literature, consumer expectations, and head drop tests performed by Dorel, all of which were presented at trial to show that there were obvious safety benefits from the use of EPS/EPP foam padding.  Samantha claims that Dorel's *only* opposing evidence on the issue of defect was that the HBB complied with FMVSS 213.  However, this assertion grossly mischaracterizes the evidence of record.   While it is true that Dorel repeatedly noted that the HBB not only met, but greatly exceeded, the requirements of FMVSS 213, Samantha fails to recognize that Dorel also offered expert testimony from Dr. William Van Arsdell that the HBB's design was reasonable and not defective, as well as an abundance of testimony showing that the HBB performed comparable to safety seats with large, padded side wings on certain safety tests.  I find that the jury had ample evidence to support its verdict that the HBB was not defective.

C.  IMPROPER JURY INSTRUCTIONS.

Lastly, Samantha argues that a new trial should be granted because of erroneous instructions to the jury.   "The test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principle without misleading or confusing the jury."   *Chaudhry v. Gallerizzo*, 174 F.3d 394, 408 (4th Cir. 1999).   As the Fourth Circuit recently stated:

> It is easy enough to pick at words, phrases, and sentences in a charge, but that overlooks the fact that the charge in its totality was what the jury heard.   A jury verdict, moreover, represents a good deal of work on the part of a good many people, and the instructions undergirding that collective effort should not succumb lightly to semantic fencing.

*Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (affirming denial of motion for new trial based on allegedly incorrect jury instructions).   District courts have great discretion in selecting appropriate jury instructions, *see Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1293 (4th Cir. 1995), and a party challenging a jury instruction faces "a heavy burden."   *Noel*, 641 F.3d at 586.   Even if a jury instruction is found to be flawed, the error must seriously prejudice the plaintiff's case before a defense verdict can be overturned.   *Hardin*, 50 F.3d at 1296.

After careful consideration, I find that the jury instructions given in this case were properly supported by the evidence and the law.

Samantha first challenges a portion of the court's Instruction Sixteen:

- 21 -

> A product is not required to have all possible safety features, and a manufacturer is not responsible for a consumer's decision to purchase a product that reasonably omits a safety feature.

(Final Jury Instructions p. 18.)   She claims that the second clause of this instruction was contrary to the evidence at trial and failed to offer significant guidance on what was "reasonable" conduct by a manufacturer.   Neither of these arguments have merit.[6]

First, Samantha claims that Instruction Sixteen was not supported by the evidence at trial because her mother, Amy Musick, never made a "decision" to purchase a car seat without a safety feature.   This argument is based on Amy Musick's testimony that she did not remember seeing car seats with large side wings at the Wal-Mart store where she purchased Samantha's HBB.   (Tr. 45-46, 55, Nov. 1, 2011.)   In the first place, even if Ms. Musick's recollection was accurate, if she had preferred a car seat with large, padded side wings, she could have bought this seat from a different store.   Moreover, Ms. Musick's testimony was not the only evidence at trial relating to consumer choice.   Samantha's own expert, Gary

---

[6]   Samantha also alleges that the cases cited by Dorel in support of Instruction Sixteen are inapplicable.   However, this argument also has no merit.   In *Austin v. Clark Equipment Co.*, 48 F.3d 833, 837 (4th Cir. 1995), the Fourth Circuit noted that the manufacturer "could not force [the consumer] to purchase [products] with the utmost safety features."   Similarly, in *Butler v. Navistar International Transportation Corp.*, 809 F. Supp. 1202, 1209 (W.D. Va. 1991), the court concluded that Virginia law, as interpreted by the Fourth Circuit, permits manufacturers to offer different safety options at different price points.   These holdings fully support Instruction Sixteen.

Whitman, testified that most child safety seats sold at the time did have large, padded side wings.   (Tr. 31, Nov. 8, 2011, morning.)   Whitman also agreed that the difference in wing size between the HBB and seats with larger wings was apparent to consumers.   (Tr. 93-94, Nov. 8, 2011, afternoon.)   Additionally, seats that had EPP or EPS padding said so on their packaging, so a consumer could choose to buy such a seat if that feature was desired.   (Tr. 102-03, Nov. 11, 2011.)   Thus, the jury could properly conclude that consumers such as Ms. Musick could make reasonably informed decisions as to the features they wanted in the car seats they purchased.

Samantha also claims that the jury could not understand what made the omission of a safety feature "reasonable" in the absence of an instruction defining reasonableness as a risk/utility calculus.   I disagree.   It is entirely proper to submit instructions to the jury that simply ask for a determination of whether conduct was reasonable.   *See Noel*, 641 F.3d at 587.   Nevertheless, this concept was already substantially addressed by Instruction Seventeen, which defined "unreasonably dangerous" in terms of balancing the ability to eliminate a danger with impairment of the product's usefulness or cost.   (Final Jury Instructions p. 21.)   Furthermore, throughout the entire trial, the jurors heard evidence weighing the alleged dangers of different safety seat designs with their comparative usefulness.   The jury was clearly aware that the reasonableness of a decision depends upon its benefits versus

its risks.   There is no reason to believe that further specificity in the instructions would have added anything to the charge.

Next, Samantha claims that Instruction Fifteen was erroneous.   Instruction Fifteen advised the jury as follows:

> In determining what constitutes an unreasonably dangerous defect, you may consider, among other things, the existence of a safer alternative design of the product.   Such evidence may assist you in determining whether or not the car seat in question was defective, but does not require that you find one way or the other as to that issue.

(Final Jury Instructions p. 17.)   Samantha argues that this instruction explains an exception to a manufacturer's duty to adopt alternative designs, without properly stating when a manufacturer is *required* to adopt an alternative design.

I disagree with this contention.   Under Virginia law, a manufacturer has a duty to design a reasonable product, not an "accident-proof one." *Turner v. Manning, Maxwell & Moore, Inc.*, 217 S.E.2d 863, 868 (Va. 1975); *see also Marshall v. H.K. Ferguson Co.*, 623 F.2d 882, 886 (4th Cir. 1980) (holding that "neither designer nor manufacturer has a legal duty to adopt or produce a process or product incorporating only features representing the ultimate in safety") (internal quotation marks and citation omitted).   Samantha is correct that, if an article can be made safer by an alternative design at no substantial increase in price, then the manufacturer has a general duty to adopt such a design.   *See Dreisonstok v.*

*Volkswagenwerk, A.G.*, 489 F.2d 1066, 1073 (4th Cir. 1974).   However, this duty is qualified by the fact that manufacturers have a right to offer different features at different price points.   *See id.*   Instruction Fifteen, which indicates that the existence of an alternative design *may* be considered but is not dispositive, is a correct statement of the law.

> Samantha also challenges Instructions Eleven and Twelve:
>
> INSTRUCTION NO. 11: A product is defective if it is proved by a preponderance of the evidence that the product was unreasonably dangerous for the use to which it would ordinarily be put, and that the unreasonably dangerous condition existed when the product left the manufacturer's hands.
>
> INSTRUCTION NO. 12: A product is unreasonably dangerous if it is unreasonably dangerous in design, or unaccompanied by adequate warnings concerning its hazardous properties.

(Final Jury Instructions p. 12-13.)   She argues that these instructions confused the jury by offering a "circular" definition of defect.   However, Samantha complains of only general inadequacy and fails to suggest any alternative definitions.   In any event, the instructions given were appropriate.   Instruction Eleven introduced the concept of "defect" as established by Virginia law, *see, e.g., Logan v. Montgomery Ward & Co., Inc.*, 219 S.E.2d 685, 687 (Va. 1975), and Instruction Twelve provided clarification of the term "unreasonably dangerous."   This sequence was logical and

- 25 -

consistent with the Virginia Model Jury Instructions.  *See* Virginia Model Jury Instructions §§ 34.075, 34.076 (2011).

Additionally, Samantha argues that the court should have offered her proposed instructions regarding the relevance and meaning of compliance with FMVSS 213.   Samantha's proposed instructions stated:

> PLAINTIFF'S   INSTRUCTION   NO.   27:    Compliance   with regulations and standards required by the National Highway Traffic Safety Administration ("NHTSA") shall be no defense to Samantha's common law claims.

> PLAINTIFF'S   INSTRUCTION   NO.   28:    Compliance   with   the minimum federal testing standards is not evidence that the government has certified a product is safe . . . .

 (ECF No. 264, p. 6-7.)

I find that Samantha's proposed instructions were properly rejected.   Courts are not required to give all instructions suggested by either party.  *See Hardin* 50 F.3d at 1294.   The HBB could not have been sold unless it complied with FMVSS 213.   Thus, the requirements imposed by FMVSS 213 were certainly relevant in assessing the reasonableness of the HBB's design.   Samantha's proposed instructions would have suggested that FMVSS 213 could not constitute a "defense" in any sense, encouraging jurors to disregard such standard entirely, contrary to Virginia and Fourth Circuit law.

- 26 -

Furthermore, the jury was given a proper instruction regarding the relevance of government safety standards:

> INSTRUCTION NO. 16A:   In determining what constitutes an unreasonably dangerous defect, you may consider, among other things, any pertinent safety standards issued by the government.   Such evidence may assist you in determining whether or not the car seat in question was defective, but does not require that you find one way or the other as to that issue.

(Final Jury Instructions p. 19.)   This instruction was legally correct and appropriately allowed the jury to determine how much weight to place on the HBB's compliance with FMVSS 213 after hearing all of the evidence presented at trial.[7]

Next, Samantha complains that the court should have instructed the jury that the fault of Albert Spicer, the driver of the other vehicle involved in the accident, was not relevant to this case.   However, I find that there was no reason to advise the jury of Spicer's fault.   As previously discussed, Spicer did not testify as a witness and was nowhere mentioned on the verdict form nor in any of the jury instructions. Samantha cannot point to any evidence showing that the jury was distracted or confused by Spicer's role in the accident.

---

[7]   Plaintiff's counsel initially submitted an affidavit of the jury foreman, Steve A. Pope, in support of Samantha's Motion for a New Trial.   The affidavit seemed to suggest possible jury confusion regarding the relevance of the HBB's compliance with FMVSS 213.   (Pl.'s Mot. for New Trial Ex. 3.).   However, at oral argument, plaintiff's counsel moved to withdraw consideration of Pope's affidavit.   In accordance with this request, I have not considered the affidavit in analyzing the appropriateness of the jury instructions.

Lastly, Samantha argues that the court's instructions improperly collapsed her three theories of liability into a single concept of "defect," depriving her of the ability to seek recovery under the various alternatives available under Virginia law. This argument has no merit.  Because I dismissed her express warranty claim, Samantha was left with only two separate causes of action — implied warranty and negligence.   It is settled law in Virginia that the elements of a product liability claim are "essentially the same whether the theory of liability is labeled warranty or negligence."  *Jeld-Wen, Inc. v. Gamble*, 501 S.E.2d 393, 396 (Va. 1998).   In order to recover under either of these theories, "the plaintiff must prove that the product contained a defect which rendered it unreasonably dangerous for ordinary or foreseeable use."  *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993).   When two product liability claims have the same elements, instructing the jury separately on each claim has many risks.  *See* Restatement (Third) of Torts: Products Liability § 2 cmt. n (1998).   For instance, the jury may assume that there is something different about the two theories, even though there is not, creating inconsistent verdicts.   Instructing the jury on one unified theory of product defect helped to avoid jury confusion and to simplify the issues without prejudice to Samantha.

- 28 -

As a final note, I must reiterate the fact that Samantha bears a "heavy burden" to show not only that a jury instruction was erroneous, but also that the error seriously prejudiced her case.   *Noel*, 641 F.3d at 586.   Even though the court had the discretion to instruct the jury differently, there is no reason to believe Samantha's case was so prejudiced, or that the same jury would have reached a different result under different, but still appropriate, instructions.

III

Of course, Samantha's condition is heart-rending, and it is impossible not to have the deepest sympathy for her and her family.   Nevertheless, the verdict of a jury must be respected, U.S. Const. amend. VII, and I find no legal basis whereby I might set aside the verdict in this case. Accordingly, it is **ORDERED** that the plaintiff's Motion for a New Trial (ECF No. 307) is DENIED.

ENTER:   March 22, 2012

/s/   James P. Jones
United States District Judge

- 29 -